along with Robert Murphy for Bulk Juliana Limited, the claimant of the motor vessel Bulk Juliana and the appellant here. This is an appeal from a summary judgment in favor of the plaintiff, a Singapore fuel supply company that supplied marine fuel known as bunkers to the Bulk Juliana, a Panamanian flag vessel in Singapore by using a Singapore subcontractor named Transocean. And what the district court held in this case was that the plaintiff's right to a maritime lien under United States law was controlled by the choice of US law clause in the plaintiff's contract with the German time charter of the vessel. We believe that was wrong for a number of reasons. Of course, it's been very heavily briefed. I can't possibly address everything that has been addressed in the briefs. So I want to focus on a couple of things. I want to point out that there's no evidence in the record that either the vessel or the vessel owner knew that this plaintiff had any involvement whatsoever in the supply of these bunkers in Singapore. The bunkers were actually supplied by a company named Transocean. What does that matter? Well, because they- And why did you argue that? I'm sorry? When did you argue that? That's in the briefs. That's in our briefs. And the reason it's important, Your Honor, is because they want to argue that under Singapore law, we had access to or knew about their general terms and conditions. And on that basis, that they could enforce those terms and conditions against us, the vessel owner and the vessel in REM. And I make that point simply to point out that without having any knowledge that they were even involved in the transaction, how could we access their terms and conditions? How could we know what contractual terms W World Fuel Services was attempting to impose on a transaction when we didn't even know? And when I say we, I mean the vessel itself didn't even know that WFS, the plaintiff, was even involved in the transaction. Well, I mean, under American law, this isn't even an issue, right? Well, I don't know what you mean. Because there's an automatic lien under American law for necessaries, right? There is a lien under U.S. law for necessaries. There is no lien under Singapore law for necessaries. I understand that. And we all know that Singapore law applies here. Are you contending, excuse me, I still don't quite understand why you're saying, why you're focusing on transaction because it seems to me you could make that argument if World Fuel had directly supplied it. We possibly could, but I'm simply addressing their contention that we somehow had knowledge of or access to the terms and conditions that they're trying to enforce against us. And it is, I think, important. I do agree with you, Judge Jones, that even if we knew they were involved, we would still be making the same argument that Singapore law controls this issue. But I'm simply addressing what they have said Singapore law requires. I mean, also addresses the choice of law question too, doesn't it? Singapore law does provide for the enforcement of contractual choice of law clauses as between the parties to the contract. But here we have a situation where they are now trying to enforce a contractual provision, choice of law provision, against a non-party to the contract because the vessel's owner and the vessel itself were not parties to the contract. And so what we're dealing with here is a situation similar to what this court addressed in the Gulf Trading versus Ho Shield case, Judge Brown's decision, in which he specifically, he made a very specific point to distinguish the fuel supplier's right to a maritime lien from the contract between the fuel supplier and the charterer. And what the import of that decision is, the right to a maritime lien does not arise out of the contract. But this court explained Ho Shield in Queen of Lemon, which is what Judge Feldman relies on. Correct. But that contract did not have a choice of law clause. That is true, but there are also some very important distinctions between the Queen of Lemon case and the Ho Shield case, and also this case, one of which was the contract at issue in the Queen of Lemon case was entered into by the vessel's owner. Well, it was the prior owner of the vessel. It was the prior owner. And the new owner claimed he didn't have notice of the prior contract, right? Correct. And the court rejected that. Well, but, important distinction, because the claimant in that case had purchased the vessel from the prior owner and therefore acquired the prior owner's rights in the vessel. The contract at issue in that case that had the choice of law clause that gave rise to the lien was entered into by the vessel's owner. So in that case, you didn't have the concern of a party to the contract encumbering the property of someone who was not a party to the contract, which is an issue here. I mean, again, if you're still focusing on the question whether your client had notice or not, I mean, the district court seems to handle that as a matter of Singapore law, right? Which you didn't contest at the district court. Well, what we said about the Singapore law at the district court is the district court's findings don't go far enough, or his analysis of Singapore law does not go far enough. Because what the cases from Singapore that were in the record and what the opinion said was that the incorporated document is incorporated into the contract as between the parties to the contract. And it says Denmark never dissented or objected to the applicability of the general terms properly incorporated by reference. Well, that's Denmark, of course, but yeah. That's correct. And Denmark was the time charter. Denmark does not have a proprietary interest in the vessel. And so what we said is there was no evidence that under Singapore law, the parties to the contract could encumber the property of a non-party to the contract. Now we know under US law, you can't do that. So the presumption is that Singapore law is the same. There was no evidence that Singapore law, parties to a contract can enforce that contract against non-parties. That's what's happening here. Again, that's not generally allowed under US law. So the presumption is that it's the same under Singapore law. So there's no evidence to establish that the plaintiff and Denmark, through their contract, could impose contractual terms on the vessel, on the vessel's owner, that had the effect of encumbering the vessel owner's rights in the vessel. There's no authority under US law or Singapore law that a time charterer, when ordering supplies, can alter the legal regime that applies to that order. So for instance, under the Federal Maritime Lean Act in this country, the charterer clearly has authority to procure necessaries for the vessel. We don't dispute that. We don't doubt that that's also true under Singapore law. The charterer has authority to procure necessaries for the vessel. Under US law, that does give rise to a maritime lien. We know that. Under Singapore law, that does not give rise to a maritime lien. We know that as well. And so what we believe the district court erred in doing is, it's one thing to say that a charterer can order supplies, can procure necessaries such as bunkers, and thereby bind the vessel to a maritime lien under US law. It's a very different thing to say that a time charterer like Denmark can agree to a contractual provision that makes US law applicable in a situation where it otherwise would not be. And especially where the effect of that is to encumber the vessel with a maritime lien that would not otherwise exist in the absence of the contract. And so again, we'll go back to- I mean, just for the, you know, to put this in a slightly broader context, Mr. Tan testified that this is a very standard term and condition in all of the fuel contracts in Singapore. Well, this leads us back to our original discussion though, because Mr. Tan says the supplier, the vessel owner can anticipate the supplier's general terms and conditions. Well, the only supplier identified to the vessel in this case was Transocean, not World Fuel Services Singapore. Well, again, I don't see that argument even being touched on by the district court. So I have some question about waiver there, but- Well, we did argue it below it. It's in the record, but we certainly made a point of showing that Transocean was the supplier. There was no notation on the documents that Transocean- But what he's saying is this is the common practice. So a vessel owner is, you know, presumed to be knowledgeable about how vessels get fuel around the world, Singapore being one of the most important ports, and therefore it's not a stretch for someone in Singapore to say that every vessel that docks in Singapore knows what the terms and conditions are for the supply of fuel. I believe that's taking what Mr. Tan said a bit too far, because what he says is vessel owners can anticipate that general terms and conditions will be incorporated into the contract. And choice of law clauses are pretty common, aren't they? Yeah, but choice of US law clauses, there's no evidence to suggest that choice of US law clauses are common in this industry. Now, we can see more cases coming out of it, but there's no evidence that says you should anticipate when you order bunkers in Singapore that the supplier's terms and conditions are gonna call for the application of US law. So I don't believe there's anything that would support that conclusion in the record. But again, I keep going back to Hohschild and the differences between Hohschild and the Liverpool and London versus Queen of Le Mans case, because the owner in the Queen of Le Mans case had entered into the contract that contained the choice of law clause. So again, there's no concern about somebody encumbering the vessel of a third party who's not involved in the contract. There was no concern in that case about enforcing the contract against someone who was not a party to the contract. Now, yes, it was a subsequent owner, but subsequent owners are successors in interest to the rights of the owner that they acquire from. Well, that depends on contract, doesn't it? Well, it does, but legally in the realm- The form of time charter depends on contract. It does, time charter does, but in the realm of maritime liens. Why don't we get to the point, assuming if we assume that American law, United States law, American law applies here, where does that lead you? Well, if you base it on the choice of law clause, then the question becomes whether the choice of law clause adequately incorporated the Federal Maritime Lien Act. It's our position that it did not. It specified the General Maritime Law. General Maritime Law, this court, the Supreme Court, have specifically recognized it is distinct from federal statutory law. You have judge-made common law, which is the General Maritime Law, and then you have a separate body of maritime statutes. Maritime Lien Act, obviously, is statutory law. It is not encompassed within the designation General Maritime Law. How do you criticize Judge Feldman's reasoning on that point? Judge Feldman followed Judge Davis in the Hebe, can't pronounce it, but the case up in Virginia. I believe Judge Davis's logic was flawed simply because under Miles v. Apex, General Maritime Remedies have to conform to federal statutory remedies where there's that overlap. That's different than saying, if you designate the General Maritime Law, you're also pulling in federal statutes. I would point out and emphasize that this plaintiff who's trying to capitalize on this contractual language, they're the ones who wrote this language. They're the ones who used this very, at best, imprecise language. They say they're part of a world conglomerate. They obviously have- Don't they have a right to rely on the Eastern District of Virginia because they were the plaintiff in that one also? They were the plaintiff. And it was the same contractual language it issued, was it not? Whether they have the right to rely on it or not does not make it correct. It's a different animal. They have, and it's true that decision came out, but it was after these bunkers were supplied, I believe. I think the district court decision came out in 2013. These bunkers were supplied in 2012. But whether it's correct or not is really the issue. And we disagree with Judge Davis's resolution of that issue. We think it's in effect rescuing them from their own poor drafting at the expense- General Maritime Law has a commonly accepted meaning, and it does commonly not mean statutory. That's correct, that's correct. Or you're reading something into it. And whether you can, you know, contextually interpret it, that term would seem, whether it's ambiguous or not. That's- If it's not ambiguous, then General Maritime Law has a, I mean, I would think an unambiguous meaning. They chose it. They chose it. They have to live with the language they chose. I see my time is up. Well, let me ask you, maybe you can address this on rebuttal, but that world fuel, that Hebe case was affirmed by the Fourth Circuit, right? Correct, on a different ground on that issue. Well, we'll talk about that on rebuttal. Yes, sir, thank you. Okay, Mr. Fay, we'll hear from you. Good morning, Your Honor. John Fay with Fay Nelson and Fay on behalf of World Fuel Services. I guess I would respond initially that we believe that all of the issues that Bolt Giuliana has raised are addressed in two very simple sources, the Queen of LeMond case that Judge Jones referred to, and the lien statute itself. The Queen of LeMond dealt with the very same issues that Bolt Giuliana raises. In particular, their focus on the fact that the in personam owner did not have knowledge of this contract. A couple of things on that issue. Ship owners get bound by these maritime liens all the time without having any knowledge, and that's the gist, and that's the basis behind the lien statute to begin with. The liens are silent, and most times the owner is not knowing about them. The vessel is chartered to a charterer like Denmark in this case, and under the charter party, with respect to fuel, the owner requires the charterer to buy the fuel for the vessel, and under the lien statute, the charterer has the ability to bind the vessel. This contract was clearly known to Denmark, and Denmark clearly, in this case, had the ability to bind the vessel. The vessel, of course, being a completely separate entity from her owner. You said under Singapore law, they had the authority to bind the vessel to a lien? Well, what I'm saying, Your Honor, is that under U.S. Maritime law, under the Federal Maritime Lien Act, they- I understand that. Okay. Maritime Lien Act, but I'm talking about just outside the Maritime Lien Act, what kind of relief, or what kind of support do you find? They'd have apparent authority, if nothing else, right? Absolutely. And they dock in Singapore, and they're the time charterer. Absolutely, and the Singapore law expert whose declaration we submitted in connection with the motion went through in detail what would happen under Singapore law if this case were decided under Singapore law. What was that? And that was that the Singapore court would look at Singapore law to determine the scope of the contract, essentially the issues related to the formulation of the contract, and then once they reached a decision on the formulation and the scope, they would see, okay, this contract has a choice of law provision in it, and so the second step would be an analysis of whether under Singapore law that choice of law provision was valid. The Singapore lawyer commented on that in his declaration, and Judge Feldman considered that evidence in reaching his decision. Now, Bulk Giuliana did not submit any evidence on Singapore law, and we don't quite know why Judge Feldman chose that tact to take, because, of course, there are one of two ways to skin the cat here. The first, Judge Feldman could have just looked at the Queen of Le Mans case and said, okay, we have a contract for the supply of bunkers to a ship. That contract has a choice of law provision in it. The choice of law provision says U.S. law. Actually, the choice of law provision in the Queen of Le Mans case was a little more complicated because it was actually two choice of law clauses. It was a broad, general-speaking English law to apply to this insurance contract. And then, secondarily, there was a specific carve-out to that choice of law, calling for the application of U.S. law in the context of obtaining a lien to secure the payment of the insurance premiums under the policy. So, the new owner, as Judge Jones pointed out, the new owner of the vessel in the Queen of Le Mans case made the very same argument that counsel here is making, namely, hey, I wasn't a party to that insurance contract that the prior owner had, and, quite frankly, it doesn't seem to make any difference the fact that, as Mr. Sloss characterized the successive owner as a successor in interest, the plain fact is that entity who purchased this vessel in good faith had absolutely no knowledge of the delinquency or the failure to pay the insurance premiums or the fact that there was a lien on the vessel. He was, like the purported owner here, he just didn't know, and the Queen of Le Mans court here said it doesn't matter. To accept that argument would basically throw the lien statute on its head because those liens arise all the time without the vessel owners knowing about it. Well, but they're not enforceable in every country of the world, though, right? That's correct, Your Honor. But the Queen of Le Mans case, same thing. I mean, that arose under facts where no connection to U.S. law other than the provision in the contract. Now, Judge Feldman also has a footnote which said something to the effect of I respectfully disagree with Professor Davis. Is that it? Yes. What's that about? Professor Davis, I think, wrote a treatise that commented generally on the propriety of impacting one's property who is not a party to the transaction. Well, that's generally the law. Well, that's exactly the point. And he also disagrees with the Second Circuit and Rainbow Line, so I assume that the Second Circuit has a different, would not have recognized this lien. I think that was Judge Feldman's interpretation. That case, I would suggest, is also distinguishable in the fact that that involved a charter party dispute, and while there is case law indicating that a breach of a charter party gives rise to a maritime lien, it's different in this case when the subject of the contract are the providing of necessaries because in the U.S., there is a public policy decision made by the legislature that we are going to make it easy for suppliers of necessaries to secure the payment of their goods and services. And so people, certain entities, are presumed to have authority to bind vessels, whether the owners know about the services purchased or the goods purchased or not. If they are necessaries ordered by one with presumed authority, like the charterer, then the lien arises and can be enforced to secure the payment. Now, isn't it also true that, you know, with regard to this question of what the general maritime law reference encompasses, it says, to be precise, the contract says the general maritime law of the U.S. shall apply with respect to the existence of a maritime lien. So to the extent that there was ambiguity about general, what gerineural maritime law refers to, it's specified in the contract. That's exactly right, Your Honor. That, you know, to construe the reference in the contract so narrowly as to be just general maritime law would completely ignore the clear intent of the contract. And it's obvious that given the expressed language. Words have meaning. I mean, why is it ambiguous to say general maritime law and to understand that that does not include statutory law? We don't think it is ambiguous. We think that Judge Davis's analysis and description of whether general maritime law includes statutory lien law is right on point. I mean, the evolution of maritime lien law has been, initially, it was a mess. And there were parties with alleged liens were making claims under various state laws. There were maritime cases. And so the initial passage of the Federal Maritime Lien Act was to codify this craziness, if you will. And so the statute. Well, both. It was actually both. If you read the cases that are cited in the briefs that talk about the history of maritime liens, it was for those very two reasons, to clarify and to codify. Are we to derive anything from the fact that the Fourth Circuit affirmed the district court opinion that Judge Feldman relied on? Well, I very much think that there should be something. Do you have an interest in that case? Well, we do, and we think it simply supports the position that World Fuel was taking here that, as a supplier, in order to facilitate these ship owners and their ships in commerce, charterers in commerce, that suppliers like this need the benefit, need to be able to protect their ability to get paid. Well, also to the point, would we be essentially creating a circuit conflict if we failed to go along with the Fourth Circuit in interpreting the consequences of a very similar provision? I think there would be a conflict, not only with that decision in the Fourth Circuit, but also with the court's decision in this circuit, in Aquino-Lamont. Well, that's just intra-circuit, which theoretically we can resolve en banc, or we can just say we don't agree. But if we conflict with the Fourth Circuit on virtually identical language, that means that you can enforce the lien in the Port of New Orleans, but you can't enforce it in Virginia. That would be a definite practical consequence of changing Judge Feldman's ruling. Yeah. Okay, does that... If I could just scan my notes to see if there were any other... I think that covers everything I had, Your Honors. Thank you. Okay, Mr. Fahy, thank you. Mr. Schloss, you have some time for rebuttal. Thank you, Your Honor. The question that Professor Davies wrote about in the article that we do cite in our briefs  in the interpretation of the Fourth Circuit? What is the source of law that gives rise to the plaintiff's claim to a maritime lien? And consistent with what this court said in the Ho Shield case, when the supplies are provided pursuant to a contract that the vessel's owner is not a party to, you don't look at the law governing the contract to determine whether a lien exists. You apply the broad choice of law factors that were discussed in the Ho Shield case. And it's important to recognize that when Judge Brown did the choice of law analysis in Ho Shield, he did not look to choice of law factors governing claims for breach of contract. He went beyond that, recognizing... There was no choice of law clause. That is correct. That is correct. So that was the precise issue before him, whereas the precise issue here and in Lamont is the strength of the choice of... I mean, what you're saying is we disregard the choice of law clause. What we are saying is you cannot enforce the choice of law clause in this case against the vessel in rem, just like they haven't even tried to enforce it against the vessel owner in persona. I, you know, this is an interesting case to me and I'm not a commodore like Judge Jolly, but... I'm a Pearl River. But what was I gonna say? I got caught up in my own joke. Oh, what about my point about circuit conflicts, though? Circuit conflicts sometimes are inevitable to reach the right result. Well, you know, the procedure in this court is that before we create a circuit conflict, we have to pre-circulate an opinion throughout to the entire court and get approval. So that's a bit of a mechanical problem. And in many cases, we will say there is a rule of prudence, sort of. We can agree or disagree with the Fourth Circuit, but for the sake of commerce, why not just have a rule rather than hope that the Supreme Court would take up and resolve this kind of issue? Well, it'll never get to the Supreme Court, probably, unless there's a conflict. That's one consideration to be given. But I would go back to asking the court to do what the law requires. Yeah, but then Bulk Giuliano is just gonna have to, well, if we don't go along with the Fourth Circuit, then Bulk Giuliano will just have to never dock in the Fifth Circuit again. And since you've got two of the largest ports in the United States here, that would be a pretty silly thing, wouldn't it? Well, I would look at it beyond just this one vessel. We've already posted security. I mean, we're gonna pay if we lose. I don't think you're gonna pay. The problem is Denmark, of course. Well, it is. But I would point out that the Fourth Circuit and the Ninth Circuit and the decisions that they have issued on this have created a circuit split that specifically said they prefer Queen of Le Mans over Rainbow Lines, but also Ho Shield. And they did not acknowledge what we consider are fundamental distinctions between the Queen of Le Mans situation and this case, which we've discussed, and also the distinctions between Queen of Le Mans and Ho Shield. And we can't emphasize enough how critical it is to acknowledge that in this case, just like in the Ho Shield case, the vessel's owner was not a party to the contract that they are arguing is the source of their right to a maritime lien. We think that is a fundamental difference, where you're talking about a choice of law clause, the effect of which is effectively to encumber the vessel with a lien that would not arise in the absence of the contract. Is the United States the only country that has a federal maritime lien law like this one? I believe France is the only one with a comparable statute. I know there are other countries that do award liens for necessaries, I don't know the details. It's a minority of the maritime countries. The majority of the maritime nations do not provide a maritime lien for necessaries. So what, so I bet you it would be quite common for fuel suppliers around the world to have American choice of law in their supply contracts. It may well be, but there's no evidence to suggest that's the case. There's no evidence. The only contract we have in this case is we have their contract. I'm just exploring the consequences of the decision. Well, again, I would urge your honors to consider the rule that you cannot encumber, two contracting parties cannot encumber the property of a third party, and you cannot generally enforce contractual provisions against non-parties to the contract. And I'll leave it at that. Thank you very much. Thank you, sir. That concludes the arguments before this panel. So this panel stands adjourned.